**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL ANTONIO MILLER,

Defendant.

Criminal No. 25-137 (JRT/ECW)

**MEMORANDUM OPINION AND ORDER ADOPTING REPORT & RECOMMENDATION**

LeeAnn K. Bell, **UNITED STATES ATTORNEY'S OFFICE,** 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for Plaintiff.

Michael Antonio Miller, Reg. No. 21845-041, Wright County Jail, 3800 Northeast Braddock Avenue, Buffalo, MN 55313, *pro se* Defendant.

Defendant Michael Antonio Miller was found to be in possession of a 120 gram-bag of fentanyl after the vehicle in which he was riding as a passenger was pulled over by a state trooper for speeding. Miller is accused of possession with intent to distribute a controlled substance. (Indictment, Apr. 9, 2025, Docket No. 1.) He moves for suppression of the fentanyl found in his possession during the traffic stop and objects to a Report and Recommendation (R&R) issued by Magistrate Judge Elizabeth Cowan Wright recommending that his motions for suppression be denied.

Miller asks the Court to suppress the evidence of his drug possession because, he argues, the underlying stop was unlawful and was unlawfully prolonged. (*See* Mot. to Suppress Evidence ("Mot."), October 28, 2025, Docket No. 27, Am. Mot. to Suppress

Evidence ("Am. Mot."), March 23, 2026, Docket No. 47.) On May 22, 2026, the Magistrate Judge issued the R&R recommending that Miller's motions to suppress be denied. (Report and Recommendation ("R&R"), May 22, 2026, Docket No. 53.) Miller requested multiple extensions to respond to the R&R (*see* Docket Nos. 54, 59, 63) and, eventually, filed seven objections (*see* Docket Nos. 62, 64–66, 69-71). Miller also filed a motion seeking to compel additional disclosure of evidence related to the stop. (Def.'s Resp. and Mot. to Compel Evidence as Discovery to the Def. ("Mot. to Compel"), June 12, 2026, Docket No. 57.)

Miller's motion to compel evidence and many of his objections to the R&R are related to his argument that any evidence related to the use of a Stalker Radar device, used by the state trooper who stopped the vehicle in which Miller was riding, should not be admitted. Miller further objects that the Magistrate Judge erred in finding the state trooper's visual speed estimate reliable. In additional objections, Miller argues that, once initiated, the stop was unlawfully prolonged.

Although the Court will consider all of Miller's objections to the R&R, the Court concludes that the state trooper had probable cause to stop the vehicle Miller was riding in, to require Miller to remain at the vehicle once it was stopped, and to prolong the stop to allow for a dog sniff. The Court will, therefore, overrule Miller's objections to the R&R and will not suppress the evidence obtained during the stop.

## BACKGROUND

### I. FACTS

#### A. Pre-Stop

On February 27, 2025, Minnesota State Trooper Matthew Holden was in a marked squad car stationed under an overpass observing westbound traffic on Interstate 94. (Tr. of Mot. Hr'g ("Tr.") at 11:19-22, 13:17–18, Dec. 31, 2025, Docket No. 37.) Holden saw a Jeep in the leftmost lane that he testified "appeared to be going faster than the posted speed limit." (*Id.* at 12:3–6.) He estimated that the Jeep was traveling at 75 miles per hour in a zone where the posted speed limit was 70 miles per hour. (*Id.* at 12:10–13.) He further testified that upon the driver of the Jeep seeing his squad car, the Jeep "visibly slowed and moved from the left lane into the middle lane." (*Id.* at 12:1–2.)

After the Jeep passed in front of Holden, he pulled out to follow the Jeep. (*Id.* at 12:17–18; *see also id.* at 38:3–40:13.) Holden estimates that he drove 90 to 100 miles per hour to catch up to the Jeep. (*Id.* at 40:15–23.) When Holden got close enough to the Jeep, he used a "Stalker Radar" to measure the Jeep's speed as 75 miles per hour. (*Id.* at 12:17-13:5.) A "Stalker Radar" is a device with "an antenna on the windshield and then another antenna in the rear." (*Id.* at 12:23–24.) He used the "same-lane method to radar the Jeep . . . ." (*Id.* at 12:25–13:2.) Once Holden got behind the Jeep, it moved from the left lane, to the middle lane, to the right lane, and then took the first available exit. (*Id.* at 13:10-18.) Holden followed the Jeep onto the exit ramp and then, as the Jeep turned

into the parking lot of the Clearwater Travel Center, initiated a traffic stop. (*Id.* at 14:12–22.)

Holden testified that he initially decided to follow the Jeep because the Jeep had visibly slowed after the driver spotted him, even though it hadn't been going "really fast," and that the driver had then moved from the left lane to the middle lane. (*Id.* at 11:23–12:2; 36:7–12.) He also testified that he found it significant that the Jeep changed lanes from the left lane to the middle lane when "there was no reason to do a lane change." (*Id.* at 13:14–20.) Finally, he noted that the Jeep taking the "first available exit after seeing the marked car" was significant to him because he had learned through his training that "it's a common tactic . . . that subjects engaging in criminal activity will often take the first available exit to try and get into a business where they feel they're safe." (*Id.* at 14:1–11.)

**B. Post-Stop**

After stopping the Jeep, Holden told the driver the reason for the stop, and the driver responded that the cruise control was set at 72 miles per hour. (*Id.* at 15:8-15.) The driver of the Jeep did not have a valid driver's license. (*Id.* at 15:18-19.) While he was speaking with the driver, Holden also noted the behavior of the Jeep's other occupants. (*Id.* at 16:1–11.) Specifically, Holden testified that he observed that the front seat passenger "was sitting very rigid in his seat" and would put his hand up to cover the left side of his face. (*Id.* at 16:4-7.) Holden also observed that Miller, the back seat passenger, was moving around such that "[e]very time I would try to look at him, he would always keep either the seat back or else the B pillar [the post located between the front and rear

doors] between us." (*Id.* at 16:8-11.) This type of behavior indicated to Holden that the other passengers were likely trying to "avoid recognition" or that they were nervous. (*Id.* at 16:16–18.)

Holden then asked the driver to step out of the vehicle and continued to talk to the driver at his squad car. (*Id.* at 17:1-6.) When Holden asked where the group was going, the driver responded that he was going to a wedding party in South Dakota. (*Id.* at 17:9-13.) The driver was not able to tell Holden where in South Dakota they were going but stated that the destination was in his GPS. (*Id.* at 17:9-16, 46:13-16.)

After running some checks, Holden learned that the driver "had multiple traffic violations and a pending felon in possession charge." (*Id.* at 19:8-9.) Holden also checked the registration and noted that the car was registered to someone who wasn't in the car. (*Id.* at 18:20–19:3.) Based on the weapons charge, the number of people in the car, and the nervousness being displayed, Holden asked for a second State Trooper to come to his location. (*Id.* at 19:18-25.)

While Holden was in his squad car, Miller got out of the Jeep and approached the car. (*Id.* at 20:13–14.) Holden testified that Miller "said his girlfriend was coming from St. Cloud to pick them up, and he wanted to leave the stop and go in to go to the bathroom." (*Id.* at 20:16–19.) Holden refused Miller's request. (*Id.*at 21:6–8.) Holden also testified that this type of request was not consistent with a normal traffic stop, and he believed

that Miller "wanted to distance himself either from the car or else try to get rid of something in the gas station." (*Id.* at 20:24–21:5.)

Around the time of Miller's request, Holden's backup, State Trooper Malstrom, arrived. (*Id.* at 20:7–11, 21:9–10.) Malstrom spoke with the front seat passenger and relayed to Holden that the front seat passenger was nervous, "fidgeting around," and may have been under the influence. (*Id.* at 21:13-19.) Malstrom told Holden that when he asked the passenger where he was going, the passenger pointed north, not towards South Dakota. (*Id.* at 21:20-22:2.) Holden testified that the fact that the vehicle's occupants indicated two different destinations could indicate criminal activity because "in my experience, they don't want to tell me the truth where they're going if they're engaging in criminal activity. So, they couldn't tell the truth so they just made something up." (*Id.* at 22:3-10.)

Holden testified that at that point, he suspected that the vehicle's occupants were engaged in criminal activity involving drugs and weapons, and he was concerned that the occupants could be armed and dangerous. (*Id.* at 23:12-23.) Holden patted down the driver, and then deployed his K-9 dog, Breki, who alerted at the rear driver's-side door, where Miller had been sitting. (Id. at 24:4-26:22.) While Holden was deploying Breki, Malstrom patted down Mr. Miller and the other passenger. (*Id.* at 27:4-8.) Malstrom told Holden that he felt a round bulge in Miller's waistband. (*Id.* at 27:9-15.) Holden then

conducted his own pat search of Miller and also felt the round bulge in Miller's waistband. (*Id.* at 27:18-22.)

Holden then searched the Jeep but did not find any contraband inside. (*Id.* at 28:13-16.) Miller and the other occupants of the Jeep were secured in squad cars while the vehicle search took place. (*Id.* at 28:4-14.) After searching the Jeep, Holden returned to the squad car where Miller had been placed and opened the door where Miller was sitting. (*Id.* at 28:20-24.) Holden then observed a bag about the size of a baseball with white powder inside on the floor of the squad car. (*Id.* at 28:25-29:2.) Later review of the squad car's footage showed Mr. Miller putting the bag on the floor. (*Id.* at 29:6-14.) The bag tested positive for drugs at the scene, and the contents of the bag later tested positive for fentanyl. (*Id.* at 29:15-20.)

## II. PROCEDURAL HISTORY

On April 9, 2025, Miller was charged by indictment with one count of Possession with Intent to Distribute a Controlled Substance. (Indictment at 1.) After Miller filed his initial motion to suppress (Mot.) and the Magistrate Judge held an evidentiary hearing, Miller filed his amended motion (Am. Mot.) and filed an additional memorandum in support of that motion (Docket No. 48). The Government filed a supplemental opposition on April 7, 2026. (Docket No. 51.) Miller filed a reply (Docket No. 52) which the Magistrate Judge also considered.

On May 22, 2026, the Magistrate Judge issued the R&R recommending that the motions to suppress be denied. After requesting multiple extensions (*see* Docket Nos. 54,

59, 63), Miller filed seven objections[1] to the R&R.[2] The Government responded. (Resp., Aug. 5, 2026, Docket No. 73.)

Miller also seeks to compel additional disclosure of evidence related to the stop, including the "receipt created by the Stalker Radar System," the brand and model of the system used, a copy of the owner's manual for the system, and all of the footage from Holden's body worn camera. (Mot. to Compel at 1–2.)

Finally, because Miller filed some of his objections to the R&R after the Court indicated that it would not accept further filings, Miller also filed a Motion to Accept Objections to the R&R. (Aug. 3, 2026, Docket No. 72.) The Court will grant that motion and has considered all of the objections Miller submitted.

## DISCUSSION

### I. STANDARD OF REVIEW

Upon the filing of a report and recommendation by a magistrate judge, "[a] party may serve and file specific written objections to the proposed findings and

[1] The Court notes that by filing these serial objections, Standby Counsel created additional confusion for the Court that could have been prevented by confirming with Miller whether a filing contained all objections prior to filing. As Standby Counsel is well aware, each party is entitled to file only one document containing objections.

[2] (First Obj., July 15, 2026, Docket No. 62; Second Obj., July 20, 2026, Docket No. 64; Third Obj., July 20, 2026, Docket No. 65; Fourth Obj., July 20, 2026, Docket No. 66; Fifth Obj., July 28, 2026, Docket No. 69; Sixth Obj., July 28, 2026, Docket No. 70; Seventh Obj., July 29, 2026, Docket No. 71.)

recommendations." D. Minn. LR 72.2(b)(1). "The objections should specify the portions of the magistrate judge's report and recommendation to which objections are made and provide a basis for those objections." *Mayer v. Walvatne*, No. 07–1958, 2008 WL 4527774, at *2 (D. Minn. Sept. 28, 2008). For dispositive motions, the Court reviews de novo "properly objected to" portions of an R&R.[3] D. Minn. LR 72.2(b)(3); *see also* 28 U.S.C. § 636(b)(1)(C); Fed. R. Crim. P. 59(b)(3). Because Miller's motions to suppress are dispositive, the Court will review the Magistrate Judge's determinations de novo. *See* D. Minn. LR 72.1(a)(3)(A).

## II. ANALYSIS

Miller seeks suppression of evidence because, he argues, the traffic stop itself was an unreasonable seizure and the traffic stop was unlawfully prolonged. The Court will address each argument in turn.

### A. Initiation of the Traffic Stop

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S.

---

[3] In civil cases, "[o]bjections which are not specific but merely repeat arguments presented to and considered by a magistrate judge are not entitled to de novo review, but rather are reviewed for clear error." *Montgomery v. Compass Airlines, LLC*, 98 F. Supp. 3d 1012, 1017 (D. Minn. 2015). It is unclear whether this rule applies in the criminal context. *See United States v. Chopra*, No. 19-305, 2021 WL 347415, at *1 (D. Minn. Feb. 2, 2021). Because the Eighth Circuit has not weighed in on the proper standard of review and because Miller's objections would fail under either standard, the Court will review the R&R de novo but will focus on the arguments raised in Miller's objection.

Const. amend. IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." *Whren v. United States*, 517 U.S. 806, 809–10 (1996). "A traffic stop is a seizure within the meaning of the Fourth Amendment and it is only constitutional if the stop was reasonable." *United States v. Holly*, 983 F.3d 361, 364 (8th Cir. 2020). But "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810.

Any traffic violation, however minor, creates probable cause to stop a vehicle. *United States v. Linnell*, 93 F.4th 1102, 1105–06 (8th Cir. 2024) (quoting *United States v. Cox*, 992 F.3d 706, 709 (8th Cir. 2021)). "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *United States v. Arciniega,* 569 F.3d 394, 397 (8th Cir. 2009) (citing *Whren,* 517 U.S. at 813). Once an officer has probable cause to stop a vehicle, "the stop is objectively reasonable and any ulterior motivation on the officer's part is irrelevant." *Id.* (citing *United States v. Bell,* 86 F.3d 820, 822 (8th Cir. 1996)).[4]

---

[4] Miller does not object to the conclusion in the R&R that "Holden's subjective purpose is not relevant as long as there was an objective reason for him to believe that a traffic violation had taken place." (R&R at 11.)

In the R&R, the Magistrate Judge concluded that Holden had probable cause to believe that a traffic stop had occurred because "Holden observed a traffic violation when he measured the Jeep's speed as 75 miles per hour . . . ." (R&R at 11.) Miller argues that the Magistrate Judge erred in finding the Stalker Radar device data reliable in the absence of foundational calibration records (First Obj. at 1–2, Second Obj. at 3, Sixth Obj. at 1–2) and in finding Holden's visual speed estimation reliable "despite the lack of additional reliable evidence or corrob[o]ration." (Second Obj. at 2).

Under Minnesota statute,

> evidence of the speed as indicated on radar . . . is admissible in evidence, subject to the following conditions:
>
> (1) the officer . . . operating the device has sufficient training to properly operate the equipment;
>
> (2) the officer . . . testifies as to the manner in which the device was set up and operated;
>
> (3) the device was operated with minimal distortion or interference from outside sources; and
>
> (4) the device was tested by an accurate and reliable external mechanism, method, or system at the time it was set up.

Minn. Stat. § 169.14, subd. 10. Miller is correct that no evidence was provided by Holden regarding his training or the set up of the device.

But an officer's visual observation of speeding is also sufficient to justify a traffic stop. *United States v. Gaffney*, 789 F.3d 866, 870 (8th Cir. 2015) (concluding that a court must consider whether the totality of the circumstances at the time of the stop supports the reasonableness of the officer's belief that a driver was speeding). Holden testified

that he was trained in visual detection of speeds (Tr. at 12:7–9) and that he had ten years of experience as a state trooper during which one of his duties was traffic enforcement, including speeding (*id.* at 9:21–24, 36:5–12, 37:8). And Holden testified that he estimated the Jeep was going 75 miles per hour in a zone where the speed limit was 70 miles per hour. (*Id.* at 12:10–13.) Therefore, under the totality of the circumstances, the Court finds that Holden's belief that the driver of the Jeep was speeding was objectively reasonable.

Miller further argues that because there is no evidence corroborating Holden's visual evidence testimony, the testimony is insufficient to support probable cause. (Second Obj. at 2.) "But probable cause to effectuate a traffic stop is not dependent on the existence of a video recording and may rest on officer testimony alone." *United States v. Perez-Mejia*, Crim. No. 25-317, 2026 WL 836819, at *2 (D. Minn. Mar. 26, 2026) (citation and internal quotation marks omitted); *see also United States v. Beard*, 708 F.3d 1062, 1066 (8th Cir. 2013) (finding that district court did not clearly err by deferring to officer's description of incident where officer had "a better view of events than the camera in his patrol car"). The Court also notes that the driver of the car indicated to Holden that prior to the stop, the cruise control was set at 72 miles per hour, that is, above the posted limit. (Tr. at 15:8-15.) And "a traffic violation—however minor—creates probable cause to stop the driver of a vehicle." *Cox*, 992 F.3d at 709 (citation omitted).

The Court concludes, consistent with the R&R, that Holden had a reasonable basis for believing the driver of the Jeep breached a traffic law and, therefore, Holden had probable cause to stop the Jeep.[5] (*See* R&R at 11.)

**B. Prolonging the Traffic Stop**

In his motions, Miller also argued that the traffic stop was unlawfully prolonged and that no reasonable suspicion justified deploying the K-9 dog. Miller objects to the conclusion in the R&R that prolonging the stop to allow for a dog sniff and then to allow for the Jeep to be searched after Breki alerted was reasonable. Miller argues that the conclusion is erroneous because "Breki is not trained or certified in the detection of fentanyl" (Third Obj. at 2), field performance records for Breki were not provided (*id.*), and Breki's alerting to a vehicle with no drugs in it undermines his reliability (*id.* at 3). Miller further objects that the there was no reasonable suspicion to detain him (versus the driver who, he contends, was "the subject of the traffic stop"). (Fourth Obj. at 3.) Finally, Miller objects that there was not reasonable suspicion to prolong the stop to conduct a dog sniff and that the R&R erroneously found such reasonable suspicion "based on nervous behavior, vague or conflicting answers about travel plans, the absence of a vehicle's owner, Defendant asking to go to the restroom, and the [driver's] pending felon in possession charge." (Fifth Obj. at 2 (citing R&R at 16), Seventh Obj. at 2 (same).)

[5] Because the Court bases this conclusion on Holden's visual observation of speeding, it will deny Miller's motion to compel evidence related to the Stalker Radar system.

### 1. K-9 Evidence

With respect to Miller's argument that prolonging the stop to allow for a dog sniff was not reasonable because the K-9 dog in question was unreliable, the Court disagrees. Testimony was provided that Breki, the K-9 dog, was nationally certified in detecting drugs including methamphetamine, heroin,[6] and cocaine through the North American Police Work Dog Association ("NAPWDA"). (Tr. at 24:19–24, 25:5–8.) Moreover, Holden had no way of knowing what drugs, if any, were in the vehicle—so the drugs the dog was certified to detect are irrelevant to the inquiry of whether prolonging the stop to allow for a dog sniff was reasonable.

The Court also concludes that there was probable cause for the subsequent search of the Jeep after Breki alerted. As noted above, testimony was provided that Breki was nationally certified and, therefore, a search based on his alert was reasonable. The absence of drugs in the vehicle at the time Breki alerted does not undermine either Breki's reliability or the reasonableness determination. (*Cf.* Third Obj. at 3.) Breki alerted to the location in the car where Miller had been sitting and where, presumably, the drugs had been present until Miller exited the car. (*See* Tr. at 26:12–22); *See, e.g.*, *United States v. Ruiz*, 664 F.3d 833, 841 n.2 (10th Cir.2012) ("Drug dogs can detect narcotics residue that is left on objects that have come into contact with drugs, even though no seizable quantity

---

[6] Heroin, like fentanyl, is an opiate. *State v. Thomas*, 464 Md. 133, 150 n.6 (2019) (quoting the *Opioid Overdose Prevention Toolkit*).

of drugs has been found." (citation omitted and cleaned up)). Similarly, Breki alerting to a drug that he was not specifically trained to detect does not mean that Breki was unreliable or that the subsequent search was not reasonable. *See, e.g.*, *Florida v. Harris*, 568 U.S. 237, 249 (2013) (concluding that alerts are not necessarily false when the substances detected are not among those a dog is specifically trained to detect).

**2. Reasonable Suspicion to Detain Miller & to Prolong the Stop**

Miller also argues that even if Holden had a reasonable basis for believing the **driver** of the Jeep breached a traffic law, Holden did not have a reasonable basis to detain Miller, a **passenger**, until a dog sniff could be conducted.

A stop justified solely by the need to investigate a traffic violation "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes,* 543 U.S. 405, 407 (2005). And although "an officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop," the officer "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez v. United States*, 575 U.S. 348, 355 (2015). But because "a dog sniff . . . is not an ordinary incident of a traffic stop," police may not extend an otherwise-completed traffic stop, absent reasonable suspicion, to conduct a dog sniff. *Id.* at 356–57.

The issue for Miller is that the traffic stop was not completed when he asked to leave—and, until that stop was completed, even though he was a passenger, he was not free to leave. As the Supreme Court has articulated,

> A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver **and passengers** ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave.

*Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (emphasis added). "An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop. *Id.*

That is, individualized reasonable suspicion solely with respect to Miller was not required to justify Miller's continued detention. At the time Miller asked to leave the scene, the traffic stop was not completed, and Miller was not free to leave without officer permission—which he did not receive.

Moreover, Holden articulated sufficient evidence to support a reasonable suspicion of criminal activity before Miller asked to leave the scene that would allow Holden to extend the traffic stop until a dog sniff could be conducted. At the time Miller asked to leave, Holden had determined that the owner of the car was not present, and that the driver was driving without a license, had multiple traffic violations, and had a pending felon in possession charge. (Tr. at 15:18–19, 18:20–19:9.) The driver had also told Holden that he and his passengers were going to a wedding party in South Dakota but had been unable to tell Holden where in South Dakota they were going. (*Id.* at 17:9-16, 46:13-14.) Holden had also noted nervousness of the occupants. (*See, e.g.*, *id.* at

17:25–18:3, 18:10–19 (noting that the driver's nervousness seemed to only be increasing as the stop progressed whereas many people's nervousness will decrease as a traffic stop progresses).) The Court concludes that given the totality of the circumstances known to Holden at the time Miller asked to leave, Holden had reasonable suspicion to prolong the stop. *See, e.g. United States v. Riley*, 684 F.3d 758, 764 (8th Cir. 2012) (noting that while nervous demeanor alone is not enough to establish reasonable suspicion, the combination of defendant's "nervous condition [and] his difficulty in answering basic questions about his itinerary" may be sufficient); *United States v. Davis*, 943 F.3d 1129, 1133 (8th Cir. 2019) (finding that third-party vehicle owner's absence contributes to a finding of reasonable suspicion).

In summary, the Court concludes that Holden had a reasonable basis to detain Miller when he asked to leave and until a dog sniff could be conducted.

## CONCLUSION

The Court concludes that Holden had probable cause to stop the vehicle Miller was riding in, to require Miller to remain at the vehicle once it was stopped, and to prolong the stop to allow for a dog sniff. The Court will, therefore, overrule Miller's objections to the R&R and will deny his motions to suppress the evidence obtained during the stop.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant Michael Antonio Miller's Motion to Accept Objections to Report and Recommendation (Docket No. [72]) is **GRANTED**;
2. Miller's objections to the Report and Recommendation (Docket Nos. [62, 64–66, 69-71]) are **OVERRULED**;
3. The Report and Recommendation (Docket No. [53]) is **ADOPTED**; and
4. Miller's Motion to Suppress Evidence (Docket No. [27]) and Amended Motion to Suppress Evidence (Docket No. [47]) are **DENIED**.
5. Miller's Response and Motion to Compel Evidence as Discovery to the Defendant (Docket No. [57]) is **DENIED as moot**.

DATED: October 21, 2026
at Minneapolis, Minnesota.

/s/ John R. Tunheim
JOHN R. TUNHEIM
United States District Judge